# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

TOM and RACHAEL KRAMER, *on behalf of themselves and others similarly situated*,

Plaintiffs,

v.

AIRBNB, INC.,

Defendant.

Case No. 25-cv-3822 (LMP/DLM)

**ORDER DENYING MOTION TO REMAND AND GRANTING MOTION TO COMPEL ARBITRATION**

Anne T. Regan and Nathan D. Prosser, **Hellmuth & Johnson PLLC, Edina, MN**; David W. Asp, **Lockridge Grindal Nauen PLLP, Minneapolis, MN**, for Plaintiffs.

Andrew M. Meerkins, **Foley & Lardner LLP, Milwaukee, WI**; Michael D. Leffel and Andrew C. Gresik, **Foley & Lardner LLP, Madison, WI**, for Defendant.

Plaintiffs Tom and Rachel KraMer brought this action, on "behalf of themselves and others similarly situated," in Minnesota state court alleging that Defendant Airbnb, Inc. violated Minnesota's Deceptive Trade Practices Act, Consumer Fraud Act, and Unfair Claims Practices Act. ECF No. 8 ¶¶ 1, 56–83. Airbnb removed the case, asserting federal jurisdiction exists under the Class Action Fairness Act of 2005 ("CAFA") or, alternatively, that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a). ECF No. 1 at 1, 3.

Airbnb now moves to compel arbitration under 9 U.S.C. § 3. ECF No. 11. The KraMers contest the motion and move to remand the case to state court, ECF No. 18, arguing that the Court does not have subject-matter jurisdiction, ECF No. 21 at 1–2.

Because the Court has subject-matter jurisdiction under CAFA, the Court denies the KraMers' motion to remand. And because the dispute is subject to a valid and enforceable arbitration agreement, the Court grants Airbnb's motion to compel arbitration and stays this action under 9 U.S.C. § 3.

## BACKGROUND

Airbnb runs an "online home rental platform" on which property owners (or "hosts") list properties for rent and "guests" rent listed properties. ECF No. 8 ¶¶ 11–12. When a property is booked, Airbnb collects a percentage of the total booking fee from both the host and the guest. *Id.* ¶ 14. The KraMers are Minnesota citizens and property owners who began listing a Minnesota property on Airbnb in 2022. *Id.* ¶¶ 37–38.

## I.    Airbnb's Terms of Service, and the KraMers' Acceptance of Those Terms

Airbnb requires all new users to agree to certain terms of service. ECF No. 13 ¶ 3. The terms applicable in 2015, when the KraMers first signed up for their account (hereinafter "Version 3") contained a "Dispute Resolution" procedure mandating that:

> any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof, or to the use of the Services or use of the Site or Application (collectively, "Disputes") will be settled by binding arbitration, except that each party retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights. You acknowledge and agree that you and Airbnb are each waiving the right to a trial by jury or to participate as a plaintiff or class member in any purported class action or representative proceeding.

ECF No. 13-5 at 21–22.

Airbnb has updated its Terms of Service many times since and requires registered users to agree to any subsequent updated terms of service to continue using Airbnb. ECF No. 13 ¶ 5. Most recently, Airbnb created Version 15 with a more detailed arbitration clause, including a delegation provision, that states:

> You and Airbnb mutually agree that any dispute, claim or controversy arising out of or relating to these Terms or the applicability, breach, termination, validity, enforcement or interpretation thereof, or any use of the Airbnb Platform, Host Services, or any Content (collectively, "Disputes") will be settled by binding arbitration on an individual basis (the "Arbitration Agreement"). If there is a dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and Airbnb agree that the arbitrator will decide that issue. For the avoidance of doubt, you and Airbnb agree that any question of arbitrability and the formation, enforceability, validity, scope, or interpretation of all or part of this [provision], including any dispute over compliance with the Pre-Dispute Notice requirement and a party's responsibility to pay arbitration fees, shall be resolved exclusively by an arbitrator.

ECF No. 13-6 at 11 (emphasis omitted). Version 15 also contained a class action waiver, requiring in part that:

> You and Airbnb acknowledge and agree that, to the fullest extent permitted by law, we are each waiving the right to participate as a plaintiff or class member in any purported class action lawsuit, class-wide arbitration, private attorney general action, or any other representative or consolidated proceeding.

*Id.* at 12. Finally, Version 15's dispute resolution section contained a carve-out provision for certain claims and provided that "a request for the remedy of public injunctive relief" was an "exception[] to the Arbitration Agreement and will be brought in a judicial proceeding in a court of competent jurisdiction." *Id.* at 11. But the carve-out provision noted that "the request for the remedy of public injunctive relief will proceed after the

arbitration of all arbitrable claims, remedies, or causes of action, and will be stayed pending the outcome of the arbitration." *Id.*

For Versions 3 through 11, Airbnb obtained assent by first emailing account users "to notify them of the impending update" and presenting the users with the updated terms when they first logged back into their account. In doing so, users "were required to affirmatively click an electronic button indicating their agreement to continue to be bound by the updated Terms." *Id.* In lay terms, a user could not access any part of the website until the user expressed affirmative agreement to the updated terms.

Airbnb modified its process starting with Version 12. For Version 12 and beyond, Airbnb obtained assent by first sending an email containing the updated terms of service. *Id.* But rather than requiring users to accept the terms immediately upon accessing the website, users "could log in and navigate Airbnb's online marketplace before agreeing to the updated Terms." *Id.* When a host attempted to perform any host-related actions, the host was "presented with the updated Terms as a pop up . . . and [was] required to affirmatively click an electronic button." ECF No. 36 ¶ 2. In lay terms, a user could not perform any host-related actions until the host user clicked to accept the updated terms.

Airbnb sent all users an email on February 11, 2025, informing them that Version 15 would go into effect on April 17, 2025. ECF No. 36 ¶ 3; ECF No. 36-1 at 2. The email informed users that after that date, they would "need to agree to the updated Terms . . . in order to book or manage reservations." ECF No. 36-1 at 2. If users did not agree to the updated terms, they could "terminate [their] agreement with Airbnb at any time by deleting [their] account." *Id.* at 2–3.

Airbnb tracks and records acceptance to updated terms by users, and "the dates and times of users' assent to each version of the Terms are recorded automatically in Airbnb's database in the ordinary course of business at or near the time of the event recorded." ECF No. 13 ¶ 7. According to Airbnb, the KraMers have agreed to new terms on 12 occasions, encompassing each new version except for Version 9. *Id.*; *see also* ECF No. 13-2. Relevant here, Airbnb's records show that the KraMers assented to Version 15 on April 18, 2025. ECF No. 13-2 at 2. This means that the KraMers went on the website, attempted to perform certain host functions, were presented with a pop-up requiring them to accept Version 15, and acknowledged their agreement by clicking through the required boxes. ECF No. 36 ¶ 2.

## II.    The KraMers' Allegations

Airbnb provides two forms of liability protection to hosts: a personal liability program and a damage protection program. ECF No. 8 ¶¶ 15, 19. The personal liability program provides hosts "with $1 million in coverage" if a host is "found legally responsible for a guest getting hurt or their belongings being damaged or stolen." *Id.* ¶ 16. The damage protection program works in the opposite direction and provides hosts "up to $3 million in the rare event" a property is "damaged by a guest" and the guest "does not pay for the damage." *Id.* ¶ 18. Airbnb uses part of the host fee to pay for the personal liability and damage protection programs. *Id.* ¶ 24. For a host to obtain reimbursement under the damage protection program, Airbnb requires the host to notify guests and Airbnb within 14 days of damage caused by a guest. *Id.* ¶ 25. If the guest does not pay within 24 hours of the notification, the host must then submit a reimbursement request to Airbnb within

30 days of the damage.  *Id.* ¶¶ 25–27.  If the host does so, Airbnb will review the request and approve or decline it.  *Id.* ¶¶ 27–28.  Airbnb's decision is final.  *Id.* ¶¶ 28, 33.

As noted, the KraMers began listing a Minnesota property on Airbnb in 2022, and Airbnb collects a 3% host fee on that property.  ECF No. 8 ¶¶ 37–39.  The KraMers allege that they chose to list on Airbnb "because of Airbnb's representations regarding" the liability and damage protection programs.  *Id.* ¶ 38.  Indeed, the KraMers have submitted payment requests under Airbnb's damage protection program from "time to time."  *Id.* ¶ 40.  But Airbnb has denied most of those requests.  *Id.* Relevant here, for example, in May 2024, guests at the KraMers' Minnesota property overflowed a whirlpool tub and caused approximately $24,000 in water damage.  *Id.* ¶¶ 41–44.  The KraMers reported the damage to the guests and to Airbnb within the required 14 days.  *Id.* ¶ 45.  After the guests failed to respond or pay for the damage, the KraMers notified Airbnb, and Airbnb sent an independent adjuster to inspect the damage later that month.  *Id.* ¶ 48.  But Airbnb declined to pay for the water damage.  *Id.* ¶¶ 49–50.

The KraMers allege that by offering personal liability and damage protection, Airbnb engages in the sale of insurance.  *Id.* ¶ 29.  But Airbnb disclaims that the programs are, legally, insurance.  *Id.*  Airbnb's position, the KraMers allege, allows Airbnb to avoid adhering to federal and state insurance laws and regulations.  *Id.*  For instance, if Airbnb's liability programs constituted insurance, Airbnb would have to establish an appraisal process and adhere to claims adjustments and settlement timelines.  *Id.*  In support of that

assertion, the KraMers point to a 2023 enforcement action taken by Washington state,[1] which fined Airbnb for engaging in the unlawful sale of insurance, required Airbnb to comply with insurance regulations, and required Airbnb to review all previously denied reimbursement requests. *Id.* ¶¶ 30–31.[2]

The KraMers brought this action accusing Airbnb of violating Minnesota's Deceptive Trade Practices Act ("DTPA"), Minn. Stat. §§ 325D.43 *et seq.*; Minnesota's Consumer Fraud Act ("MCFA"), Minn. Stat. §§ 325F.68–.70; and Minnesota's Unfair Claims Practices Act ("UCPA"), Minn. Stat. § 72A.01 *et seq.* ECF No. 8 ¶¶ 56–83. The KraMers bring the action on their own behalf and on behalf of a class of all "Airbnb hosts in Minnesota since September 2019 to the present." *Id.* ¶ 52. The KraMers purport to bring their MCFA and UCPA claims—which do not contain a private right of action— under Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which allows private citizens to enforce certain laws on behalf of the public, *id.* ¶¶ 71, 81.

The DTPA claim alleges that Airbnb: (1) deceptively marketed its damage protection program as if it were "governed by terms and standards of conduct applicable to insurance policy contracts," *id.* ¶ 57; (2) deceptively represented that its damage

---

[1]    *See In the Matter of Airbnb, Inc.*, Order No. 23-0108 (Wash. Off. Ins. Comm'r 2023) (link can be found at [https://perma.cc/B4LJ-T7D2]).

[2]    The KraMers allege that Airbnb has approximately 3,000 Minnesota hosts, with approximately 1,500 active listings at any given time. *Id.* ¶ 13. But Airbnb approves less than one-third of all requests for reimbursement from Minnesota hosts. *Id.* ¶ 31. By comparison to public data from Washington, the KraMers believe that Airbnb has denied thousands of claims from Minnesota hosts. *Id.* ¶¶ 33–35.

protection program would provide hosts with protected coverage; *id.* ¶ 58; and (3) made deceptive statements that Airbnb would cover damage caused by guests, *id.* ¶ 59.

The MCFA claim alleges that Airbnb engaged in "unfair" and "misleading" practices by stating that its host protection programs "would provide coverage for certain property loss expenses" but then "created policies and procedures that would result in the non-payment of valid" claims. *Id.* ¶¶ 66–67. The KraMers also allege that Airbnb intended for potential hosts to rely on the misleading statements and that hosts did indeed rely on the misleading statements. *Id.* ¶ 68. In fact, the KraMers allege that they and fellow class members "would not have listed their properties with [Airbnb] if they had known that [Airbnb] was engaging in unauthorized practices." *Id.* ¶ 69.

Finally, the UCPA claim alleges that Airbnb sells unlicensed and unregulated insurance products and that, by doing so, Airbnb fails to comply with Minnesota laws and regulations. *Id.* ¶¶ 76–80.

The KraMers seek an order requiring Airbnb to "review all previously denied" claims submitted to Airbnb since August 1, 2019, and to pay out meritorious claims. *Id.* at 17. The KraMers also seek monetary relief, such "as disgorgement and restitution, a refund of service fees paid by Minnesota Hosts," *id.* ¶ 4, "restitution and disgorgement under the general equitable powers of this Court," "costs and attorneys' fees," and "such further relief as provided by law or equity," *id.* at 17–18.

## III.   Procedural History

The KraMers brought this complaint in Minnesota state court on September 2, 2025. *See generally* ECF No. 1-1. On October 1, 2025, Airbnb removed the complaint to this

Court, asserting federal jurisdiction under CAFA because the purported class is minimally diverse, has more than 100 members, and the amount in controversy exceeds $5 million. ECF No. 1 at 1, 3 (citing 28 U.S.C. § 1332(d)(2)).  As to CAFA's amount in controversy requirement, Airbnb pointed out that the complaint seeks "disgorgement of profits and restitution" that Airbnb gained from the "thousands" of Minnesota hosts who rented their properties through Airbnb since 2019.  ECF No. 1 at 5, 7 (quoting ECF No. 1-1 ¶ 74). According to Airbnb, its business records "regarding the number of putative class members and Airbnb's revenue in Minnesota during the proposed class period" show that "the amount in controversy exceeds $5 million." *Id.* at 7.  Alternatively, Airbnb asserts diversity jurisdiction under 28 U.S.C. § 1332(a) because the KraMers and Airbnb are diverse, and the amount in controversy for the KraMers' claims exceeds $75,000.  ECF No. 1 at 4.

On October 23, 2025, Airbnb moved to compel arbitration.  ECF No. 11.  The KraMers, in response, moved to remand.  ECF No. 18.  The KraMers also oppose Airbnb's motion to compel arbitration and argue that Airbnb's arbitration provisions are inapplicable or unenforceable.  ECF No. 32 at 2.

### ANALYSIS

Because Plaintiffs' motion to remand implicates the Court's subject-matter jurisdiction, the Court must begin there.  *See Barclay v. ICON Health & Fitness, Inc.*, No. 19-cv-2970 (ECT/DTS), 2020 WL 6083704, at *4 (D. Minn. Oct. 15, 2020) ("[C]ourts faced with both a question of jurisdiction over the entire case and a question of arbitration address jurisdiction first.").

9

I.    **Motion To Remand[3]**

Federal courts are courts of "limited jurisdiction, possessing only that power authorized by Constitution and statute." *Minnesota ex rel. Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 708 (8th Cir. 2023) (quoting *Gunn v. Minton*, 586 U.S. 251, 256 (2013)). Three jurisdictional statutes are relevant here. First, 28 U.S.C. § 1441(a) provides that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." Second, 28 U.S.C. § 1332(a) provides that federal district courts have original jurisdiction over any claim when the amount in controversy exceeds $75,000 and there is diversity of citizenship between the parties. Third, CAFA—codified at 28 U.S.C. § 1332(d)(2)—provides original jurisdiction over class actions if: (1) minimum diversity exists,[4] (2) the proposed class has at least 100 members, and (3) there is more than $5 million in controversy. *Leflar v. Target Corp.*, 57 F.4th 600, 603 (8th Cir. 2023). If either CAFA or diversity jurisdiction exists, the Court has subject-matter jurisdiction over this action.

---

[3]    The KraMers' motion to remand challenges the factual basis that Airbnb relies on for its assertion that subject-matter jurisdiction exists, so the Court may consider "matters outside the pleadings, such as testimony and affidavits." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914–15 (8th Cir. 2015).

[4]    Under CAFA, minimum diversity exists if "at least one plaintiff and defendant" are citizens of different states. *Leflar*, 57 F.4th at 603.

CAFA opened "federal courts to more class-action lawsuits." *Id.* Under CAFA, a defendant may remove a class-action complaint to federal court along with a notice of removal that "plausibly allege[s]" CAFA's three jurisdictional requirements. *Id.* (citation omitted). If the removal notice does not plausibly allege CAFA jurisdiction, a court must "remand the case right back" to state court. *Id.* If a plaintiff moves for remand, it is the removing defendant's burden to show "by a preponderance of the evidence that the case meets each one of the requirements." *Id.* (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 88–89 (2014)). The burden is not high, and the defendant must only prove that "'a fact finder *might* legally conclude' that the value of the case is more than $5 million, not whether damages '*are* greater than the requisite amount.'" *Id.* (quoting *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 944 (8th Cir. 2012)). If a defendant establishes by a preponderance of the evidence that damages might exceed the $5 million threshold, a plaintiff contesting removal can only defeat jurisdiction by showing that it is "legally impossible for the plaintiff to recover that much." *Pirozzi v. Massage Envy Franchising, LLC*, 938 F.3d 981, 984 (8th Cir. 2019).

Here, Airbnb's notice of removal plausibly alleges that the case is worth more than $5 million because the notice points to the KraMers' intention to seek disgorgement of fees Airbnb received from thousands of Minnesota hosts since 2019 and affirms that Airbnb received more than $5 million in fees from those hosts during that time. ECF No. 1 at 7. The KraMers contest those calculations, so Airbnb must support its amount in controversy assertions by a preponderance of the evidence. *Leflar*, 57 F.4th at 603. In response to the motion to remand, Airbnb relies on the same legal theory of damages, but this time also

11

attaches a declaration from an employee who attests that, "[b]ased on [his] review of Airbnb's revenue data from rentals of Minnesota properties listed by hosts from September 1, 2019, to October 1, 2025, Airbnb received more than $5 million in revenue from fees paid by hosts with listings in Minnesota."  ECF No. 31 ¶ 2.

The KraMers do not argue that Airbnb's declaration is insufficient to establish that Airbnb received more than $5 million in host fees since 2019.  Instead, the KraMers first argue that Airbnb's calculation is irrelevant because they do not seek "to disgorge all of Defendant's Minnesota revenue earned since 2019."  ECF No. 21 at 6; *see also id.* at 7 (arguing that because Plaintiffs "do not seek to recover the full amount of Airbnb's Minnesota revenue, Defendant cannot point to that amount to establish the amount in controversy").  The KraMers instead clarify that they seek only "disgorgement or restitution of the amounts improperly gained by [Airbnb] for its failure to comply with Minnesota laws."  ECF No. 21 at 6.  The "improper gain," the KraMers say, is something less than a "full reimbursement of the 3% service fee paid by putative class members."  *Id.* at 7.  But the standard for determining the amount in controversy under CAFA "is not what [a plaintiff] argues he will ask for but what a fact finder could legally award."  *Brunts v. Walmart, Inc.*, 68 F.4th 1091, 1094–95 (8th Cir. 2023).  Moreover, the KraMers' assertion is contradicted by their own complaint.  Indeed, the KraMers state in the complaint's introduction that they seek, "as disgorgement and restitution*, a refund of service fees paid by Minnesota Hosts.*"  ECF No. 8 ¶ 4 (emphasis added).  The complaint later claims "equitable relief as determined by the Court including but not limited to disgorgement of *profits* and restitution."  *Id.* ¶ 74 (emphasis added).  Accordingly, the complaint alleges

12

entitlement to the entire amount of service fees paid by Minnesota hosts. Airbnb's unchallenged evidence establishes that it received more than $5 million in such fees.

The KraMers alternatively "concede that they are not entitled to full reimbursement of the 3% service fee," but only some percentage of those fees.[5] ECF No. 21 at 7. Without explicitly saying so, the KraMers appear to argue that it is "legally impossible" for them to recover the full 3%. *See Pirozzi*, 938 F.3d at 984. In support, the KraMers cite *Taqueria El Primo LLC v. Illinois Farmers Insurance Company*, 691 F. Supp. 3d 940 (D. Minn. 2023), for the proposition that a "full refund of insurance premium[s]" paid is not an "available measure of classwide damages under Minnesota Consumer Fraud Act." ECF No. 21 at 7. But the KraMers overstate *Taqueria El Primo*'s holding. In that case, the court held that a full refund was not an appropriate remedy concluding that the insurance policies at issue had "at least some value" to the plaintiffs notwithstanding the defendant's wrongdoing, and a refund of the full amount of insurance premiums the plaintiff paid was therefore not proportionate to the damages it suffered. *Taqueria El Primo*, 691 F. Supp. 3d at 968. The court did not cite nor purport to base its holding on a generally applicable principle of Minnesota law that prohibits a full refund in every MCFA action; rather, the court merely concluded that the facts before it did not warrant a full refund. It may well be, in this case, that a full refund of the service fees paid by Minnesota hosts since 2019 is

---

[5]    To the extent that the KraMers intend this statement to be a legally binding concession that they *will not* seek the full 3%, such a concession is ineffective at this stage. *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 593 (2013) ("[A] plaintiff who files a proposed class action cannot legally bind members of the proposed class before the class is certified.").

an unlikely or even disproportionate remedy, but *Taqueria El Primo* provides no reason to conclude that it is a *legally impossible* one.  *Raskas v. Johnson & Johnson*, 719 F.3d 884, 888 (8th Cir. 2013) ("Even if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy, this does not meet the legally impossible standard.").

Plaintiffs also point to *State v. Minnesota School of Business, Inc.*, 935 N.W.2d 124 (Minn. 2019), but that case supports the proposition that it is legally possible to receive a full refund.  In that case, Minnesota's attorney general sued two for-profit schools under the DTPA and MCFA for falsely advertising the value of certain degrees offered by the schools to mislead prospective students and convince them to enroll.  *See id*. at 127–29.  After a bench trial, the state district court concluded that the schools had engaged in fraud and false advertising and fashioned a restitution order that required the schools to return "the total tuition, fees, and other costs" the students had paid to the schools in reliance on the false advertising.  *Id.* at 139.  In affirming that restitution award, the Minnesota Supreme Court found the remedy a reasonable approximation of the "gains" the schools reaped "as a result of their violations of the MCFA."  *Id.*  Here, as in *Minnesota School of Business*, the KraMers assert Airbnb misled prospective hosts about the host protection programs to convince them to list their properties on Airbnb, and that the KraMers and all other class members "would not have listed their properties with [Airbnb] if they had known that [Airbnb] was engaging in unauthorized practices" under the MCFA.  ECF No. 8 ¶ 69.  *Minnesota School of Business* suggests that it is entirely possible that Plaintiffs could

14

receive an award of the total fees the class members paid to Airbnb in reliance on Airbnb's allegedly false marketing.

In sum, the complaint itself requests "a refund of service fees paid by Minnesota Hosts," *id.* ¶ 4, the uncontradicted evidence from Airbnb shows that it received more than $5 million in service fees from Minnesota, and the KraMers have not demonstrated that an award of more than $5 million is legally impossible. The Court therefore concludes that it has original jurisdiction over the complaint under CAFA and, accordingly, denies the KraMers' motion to remand.

## II.  Motion To Compel

The Federal Arbitration Act ("FAA") "establishes a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505–06 (2018) (citation omitted). A party may compel arbitration instead of litigation where the parties have contractually agreed to arbitrate a dispute, and a motion to compel arbitration "must be granted if a valid arbitration clause exists which encompasses the dispute between the parties." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1089 (8th Cir. 2021) (citation omitted); *see* 9 U.S.C. § 2 (stating that a contractual agreement to "submit to arbitration an existing controversy . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract").

Initially, the "party seeking to compel arbitration bears the burden to prove" the existence of an agreement to arbitrate. *Ballou v. Assert Mktg. Servs., LLC*, 46 F.4th 844, 851 (8th Cir. 2022). Historically, if the moving party proved the existence of an agreement, the "party resisting arbitration" could still avoid arbitration by arguing to a federal court

15

that "the arbitration provision is invalid or that it does not encompass the claims at issue." *Triplet v. Menard, Inc.*, 42 F.4th 868, 870 (8th Cir. 2022). But many modern arbitration agreements include a "delegation" provision located within an arbitration provision in which the parties agree that "an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). When an arbitration provision contains a delegation provision, questions as to whether the arbitration provision encompasses a given claim, or even whether the arbitration provision is valid, must themselves be referred to arbitration. *See Shockley v. PrimeLending*, 929 F.3d 1012, 1018 (8th Cir. 2019) (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010)) (explaining that a "delegation provision places 'gateway questions of arbitrability' into the hands of an arbitrator," including "determining the validity of the arbitration agreement itself"). To avoid delegating such threshold questions, the party opposing arbitration must specifically attack the delegation provision itself. *See Rent-A-Center*, 561 U.S. at 68–69. "[A]bsent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024).

Airbnb moves to compel arbitration, citing the arbitration clauses found in both Version 3 and Version 15 of Airbnb's terms of service. ECF No. 11. In response, the KraMers concede that they agreed to Version 3 but argue that they never agreed to Version 15, and otherwise attack the scope, validity, and enforceability of both Versions' arbitration clauses and Version 15's delegation provision. *See* ECF No. 32 at 2, 11–12. Airbnb replies that Version 15 applies, and, that because Version 15's delegation provision

16

is also valid, all questions raised by Plaintiffs must be reserved for the arbitrator. ECF No. 35 at 19.

Because the arbitration clauses found in Version 3 and Version 15 are materially different, the Court must first determine whether the KraMers agreed to the arbitration provision in Version 15.

### A.      The Applicability of Version 15

It is Airbnb's burden to prove the existence of an agreement to arbitrate. *Ballou*, 46 F.4th at 851. Here, the question is whether the KraMers agreed to Version 15. ECF No. 32 at 11–12. Because this is a question of contract law, the Court must apply ordinary principles of state law; here, both parties acknowledge that California contract law applies. *See id.*; ECF No. 12 at 13.

The Ninth Circuit has directly addressed this issue in at least two cases—*Jackson v. Amazon.com, Inc.*, 65 F.4th 1093 (9th Cir. 2023), and *Ireland-Gordy v. Tile, Inc.*, No. 25-403, 2026 WL 594859 (9th Cir. Mar. 3, 2026)—which leads the Court to conclude that the KraMers assented to Version 15. In both *Jackson* and *Ireland-Gordy*, the Ninth Circuit explained that under California law, when a company seeks to enforce an arbitration provision found in updated terms of service, "the burden is on [the company] as the party seeking arbitration to show that it provided notice of a new [terms of service] and that there was mutual assent to the contractual agreement to arbitrate." *Jackson*, 65 F.4th at 1099; *Ireland-Gordy*, 2026 WL 594859, at *2. In other words, an arbitration agreement found in an updated terms of service is enforceable if the company: (1) "provides reasonably conspicuous notice of the terms to which the consumer will be bound"; and (2) "the

17

consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests . . . assent to those terms." *Ireland-Gordy*, 2026 WL 594859, at *3 (quoting *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022)). Both conditions are satisfied here.

As to "reasonably conspicuous notice," the Court must determine whether a "reasonably prudent user" would have read the terms of service by cumulatively considering: (1) the "context of the transaction"; (2) the notice's "design and content"; and (3) "other notices given to users." *Id.* (citations omitted). Each factor favors a finding of adequate notice here. First, the context of the transaction supports a finding of notice because the KraMers "provided an email address during account registration, and should have expected to receive relevant updates there while the account was active," *id.*, and Airbnb emailed the KraMers informing them about Version 15, ECF No. 36 ¶ 3; ECF No. 36-1 at 2. Second, the design and content of that email support a finding of notice, as the email's sole purpose was to inform the KraMers of the updated terms, and the email contained a hyperlink to the updated terms and was clear and legible. *See* ECF No. 36-1 at 2. And third, Airbnb provided additional notice to the KraMers when they first logged into their account after Version 15 went into effect.[6] ECF No. 36 ¶ 2.

---

[6] This last factor was noticeably absent in *Ireland-Gordy*, where the company had only emailed the user informing the user of the updated terms. *Id.* at *4 (noting that the "lack of other notices given by [the company] to its users weighs against finding inquiry notice"). The Ninth Circuit opined that the company "could have done more to ensure that all its users were on inquiry notice" by, for example, interrupting "users' next visit to the [website] with a clickwrap pop-up notice." *Id.* But even without this third factor, the Ninth

As to assent, Airbnb's records confirm that the KraMers logged into their account and accepted Version 15's terms of service by clicking through a pop-up box on April 18, 2025. ECF No. 13-2 at 2; *see also* ECF No. 32 at 13 (acknowledging that the KraMers logged into their account on April 18, 2025). This constitutes unambiguous assent. *Berman*, 30 F.4th at 856 (citations omitted) (noting that so-called "'clickwrap' agreements" show that a "consumer has received notice of the terms being offered and . . . knows or has reason to know that the other party may infer from his conduct that he assents" (internal quotation marks omitted)); *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016) ("Courts around the country have recognized that this type of electronic 'click' can suffice to signify the acceptance of a contract."); *Foster v. Walmart, Inc.*, 15 F.4th 860, 863 (8th Cir. 2021) (citation omitted) (noting that "courts rarely find problems with clickwrap agreements"). Because Airbnb provided "reasonably conspicuous notice of the terms," and because the KraMers took "some action, such as clicking a button or checking a box, that unambiguously manifests" assent to those terms, Airbnb has met its burden to show that Version 15 applies. *Ireland-Gordy*, 2026 WL 594859, at *3. And because the KraMers agreed to Version 15, they agreed to its arbitration clause. *Id.* at *5.

## B.     Version 15's Delegation Provision

As earlier identified, Version 15 contains a specific delegation provision:

> If there is a dispute about whether this Arbitration Agreement can be enforced or applies to our Dispute, you and Airbnb agree that the arbitrator will decide that issue. For the avoidance of doubt, you and Airbnb agree that any

---

Circuit found adequate notice. *Id.* Here, Airbnb did precisely what the Ninth Circuit explained that a company should do to ensure adequate notice.

question of arbitrability and the formation, enforceability, validity, scope, or interpretation of all or part of this [provision] . . . shall be resolved exclusively by an arbitrator.

ECF No. 13-6 at 11 (emphasis omitted).  Airbnb argues that Version 15's broad delegation provision requires the Court to send all remaining questions raised by the KraMers to the arbitrator.  ECF No. 35 at 19.  The KraMers acknowledge the breadth of the delegation provision but seek to avoid it by arguing that it is "unconscionable" and therefore unenforceable.  ECF No. 32 at 16–19.

"Under California law, a court may refuse to enforce a provision of a contract if it determines that the provision was 'unconscionable at the time it was made.'" *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1000 (9th Cir. 2021) (quoting Cal. Civ. Code § 1670.5(a)).  To establish this defense, the party opposing arbitration "must demonstrate procedural and substantive unconscionability." *Id.*  Procedural unconscionability focuses on "'oppression' or 'surprise' due to unequal bargaining power," whereas substantive unconscionability focuses on "'overly harsh' or 'one-sided' results." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1210 (9th Cir. 2016) (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000)).  Although both procedural and substantive unconscionability are required, "[c]ourts analyze unconscionability on a sliding scale: 'the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required . . . and vice versa.'" *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1013 (9th Cir. 2023) (quoting *Armendariz*, 6 P.3d at 690).

The KraMers are correct that, in theory, a court can strike a delegation provision for unconscionability. *Rent-A-Center*, 561 U.S. at 73; *see* 9 U.S.C. § 2.  But the Court may

only do so if the KraMers prove that the delegation provision itself is unconscionable, not merely that the arbitration agreement as a whole is unconscionable. *Brennan v. Opus Bank*, 796 F.3d 1125, 1132 (9th Cir. 2015) (explaining that where a valid arbitration agreement that "clearly and unmistakably delegates arbitrability questions to the arbitrator" exists, "the only remaining question is whether the particular agreement to *delegate* arbitrability . . . is itself unconscionable"). To do so, the KraMers must show how the delegation provision itself is "oppressi[ve]" or "surpris[ing]," and how the provision is "overly harsh" or "one-sided." *Mohamed*, 848 F.3d at 1210 (citation omitted).

### i.     Procedural Unconscionability

The KraMers argue that the delegation provision is procedurally unconscionable because it is contained in a contract of adhesion. ECF No. 32 at 16–18. A contract of adhesion is one "'imposed and drafted by the party of superior bargaining strength,' and only gives the weaker party 'the opportunity to adhere to the contract or reject it.'" *Bielski*, 87 F.4th at 1014 (quoting *Armendariz*, 6 P.3d at 689). Under that definition, the Court has little difficulty concluding that Airbnb's delegation provision is included in a contract of adhesion. As Airbnb acknowledges, the KraMers were required to either accept Version 15 and its delegation provision or delete their account. ECF No. 36-1 at 2–3 (informing the KraMers that "[i]f you disagree with the updated Terms or Privacy Policy, you may terminate your agreement with Airbnb at any time by deleting your account"). That is a classic contract of adhesion. *See, e.g., Bielski*, 87 F.4th at 1014 (holding contract requiring users to either "accept the delegation provision or forgo a Coinbase account" was a contract

of adhesion); *Plazza v. Airbnb, Inc.*, 289 F. Supp. 3d 537, 557 (S.D.N.Y. 2018) (finding "Airbnb's [Terms of Service] is a standard adhesion contract").

The KraMers assert that "[p]rocedural unconscionability may be found on this factor alone." ECF No. 32 at 18. But that is not quite true. It is true that contracts of adhesion "contain[] some level of procedural unconscionability," but that only goes to a finding of oppression, and does not show a contract to be procedurally unconscionable in and of itself. *See Bielski*, 84 F.4th at 1014. Instead, a court must also analyze whether the user would have been surprised by the challenged provision. *Id.* Here, the KraMers make no argument that the delegation provision is procedurally unconscionable beyond stating that it is included in a contract of adhesion. As a result, the Court finds "some level of procedural unconscionability," but it is "low." *Id.*

### ii.    Substantive Unconscionability

Substantive unconscionability relates to "the fairness of an agreement's actual terms." *Id.* (quoting *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1232 (Cal. 2012)). The analysis focuses on whether the terms are "overly harsh, unduly oppressive, or unfairly one-sided." *Lim*, 8 F.4th at 1002 (citing *OTO, L.L.C. v. Kho*, 447 P.3d 680, 692–93 (Cal. 2019)).

The KraMers first argue that the delegation clause is substantively unconscionable because "it takes the issue of contract formation away from the courts." ECF No. 32 at 18. The KraMers appear to believe that because the delegation provision refers disputes concerning the "validity" of the arbitration agreement to arbitration, questions about whether the parties agreed to Version 15 must also be referred to arbitration. But, as the

22

KraMers correctly explain, it is always for a court to consider whether "a valid arbitration agreement exists." *Henry Schein*, 586 U.S. at 69; *see Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) ("[A] court must resolve any challenge that an agreement to arbitrate was never formed, even in the presence of a delegation clause."). Indeed, the Court here *has* decided that a valid agreement was formed. The KraMers' concern is misplaced.

The remainder of the KraMers' substantive unconscionability arguments are unavailing because they do not focus on the delegation provision itself. For instance, the KraMers argue that the arbitration provision prohibits them from bringing private attorney general actions and that limitation makes the arbitration provision substantively unconscionable. ECF No. 32 at 19–20; *see also* ECF No. 13-6 at 12. That may be so, but the KraMers make no argument as to why the prohibition on private attorney general actions makes the *delegation provision* unconscionable. Put another way, the KraMers make no argument that they cannot fairly present such an unconscionability argument to an arbitrator. *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023) ("[I]f a party cites provisions outside of the delegation clause in making an unconscionability challenge, it must explain how those provisions make the fact of an arbitrator deciding arbitrability unconscionable."); *Brennan*, 796 F.3d at 1133 (enforcing delegation provision despite user's argument that other provisions of the arbitration provision were unconscionable). To the contrary, the KraMers are free to argue to an arbitrator that the arbitration provision unconscionably limits their private attorney general rights. If successful, they may return to federal court to pursue those claims.

23

Likewise, the KraMers next argue that the "fee-splitting provisions" and "discovery limitations" used in arbitration are unconscionable, ECF No. 32 at 21–23, but these arguments fail for the same reason. Indeed, these exact arguments were rejected in *Rent-A-Center* for being insufficiently connected to the unconscionability of the delegation provision. There, as here, a user attempted to lodge an unconscionability challenge to a delegation provision by pointing to "procedures called for by the contract—the fee-splitting arrangement and the limitations on discovery." *Rent-A-Center*, 561 U.S. at 74. But the user failed to explain how either made the delegation provision—as opposed to arbitration generally—unconscionable. *Id.* Without doing so, the user did no more than assert that "the fee-sharing and discovery procedures rendered the *entire* Agreement invalid." *Id.* As in *Rent-a-Center*, the KraMers make no argument as to why the fee-splitting provision or discovery limitations make the delegation provision itself unconscionable. Again, the KraMers are free to attack the unconscionability of these provisions before an arbitrator. But there is nothing the KraMers point to that makes the delegation itself unconscionable. *Brennan*, 796 F.3d at 1133 (noting that "it is for the arbitrator to decide" whether an arbitration provision as a whole is unconscionable); *Barclay v. Icon Health & Fitness, Inc.*, 550 F. Supp. 3d 710, 721 (D. Minn. 2021) ("No matter the merit of these arguments, they are not tailored to the delegation provision specifically and do not explain why it would be unconscionable for an arbitrator to decide the unconscionability question.").

Because the KraMers have not shown that the delegation provision is unconscionable, the Court finds it valid.

24

## C.    The KraMers' Remaining Arguments

Generally, so long as a delegation provision is valid, a court's "inquiry is at an end, and all other questions must go to an arbitrator." *Shockley*, 929 F.3d at 1018 (citing *Rent-A-Center*, 561 U.S. at 70). Yet the KraMers make several other arguments in an effort to avoid arbitration. First, the KraMers argue that their claims fall squarely outside the arbitration provision's reach. ECF No. 32 at 7–9. Next, they argue that the arbitration provision's ban on private attorney general actions is impermissible and unenforceable. *Id.* at 9–11. And, finally, they assert that Airbnb cannot invoke the FAA to force arbitration because the McCarran-Ferguson Act reverse preempts the FAA in this case. *Id.* at 23–29. The first two arguments fall squarely within the delegation provision's scope and must be themselves referred to arbitration for the reasons already discussed. The preemption argument under the McCarran-Ferguson Act is meritless.

### i.    Public Injunctive Relief

Version 15's dispute resolution section carves out "a request for the remedy of public injunctive relief" as an "exception[] to the Arbitration Agreement and [may] be brought in a judicial proceeding in a court of competent jurisdiction." ECF No. 13-6 at 11. The KraMers argue that because their claims demand "public injunctive relief," the claims fall squarely within the arbitration provision's "exceptions." ECF No. 32 at 6. And because the KraMers believe it to be plainly evident that their claims are non-arbitrable, they request that rather than forcing "an arbitrator to determine whether the agreement expressly exempts this case from arbitration," the Court should apply the carve-out provision now

25

and save them from undergoing a potentially lengthy arbitration just to return to federal court.  ECF No. 32 at 8.

That the KraMers' claims might not be subject to arbitration does not entitle the Court to disregard the express language of the delegation provision, which requires an arbitrator to decide "whether this Arbitration Agreement can be enforced or applies to [the] Dispute."  ECF No. 13-6 at 11.  To the contrary, "if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."  *Henry Schein*, 586 U.S. at 69; *see Tempe Hosp. Ventures, LLC v. Highgate Hotels, LP*, No. 22-16330, 2023 WL 8712059, at *1 (9th Cir. Dec. 18, 2023) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1076 (9th Cir. 2013)) (explaining that whether a carve-out provision permits a party "to litigate in the district court its claim seeking declaratory relief is a delegable question because 'when a tribunal decides that a claim falls within the scope of a carve-out provision, it necessarily decides arbitrability'").  It may be that an arbitrator will conclude that the claims are carved out from arbitration, and that considerable time passes before the parties are able to return to federal court.  But the FAA contains no exception for potential delay, and the Court may not "engraft [its] own exceptions onto the statutory text."  *Henry Schein*, 586 U.S. at 70.  And, if the KraMers' assertion that this case is exempt from arbitration is true, an arbitrator will quickly rule as much.  *Id.* at 71 (explaining that arbitrators can "efficiently dispose" of cases by "quickly ruling that a claim is not in fact arbitrable").

### ii.    Private Attorney General Action

The KraMers next argue the arbitration provision "operates to negate and prospectively waive" their private attorney general claims. ECF No. 32 at 9. They ask the Court to find the limitation "impermissible, unenforceable, and . . . unconscionable." *Id.* at 10. Again, the delegation provision provides that any questions about the "formation, enforceability, validity, scope, or interpretation of" the arbitration provision "shall be resolved exclusively by an arbitrator." ECF No. 13-6 at 11. It is simply not up to the Court to decide, as the KraMers urge, whether the waiver is "invalid and unenforceable." ECF No. 32 at 11.

### iii.    The McCarran-Ferguson Act

Finally, the KraMers assert that Airbnb's arbitration motion "is reverse-preempted by the McCarran-Ferguson Act." ECF No. 32 at 23.

The McCarran-Ferguson Act, in essence, seeks to prohibit "inadvertent federal preemption of state insurance-regulating statutes," *Guardian Flight LLC v. Godfread*, 991 F.3d 916, 921 (8th Cir. 2021), by prohibiting "the application of federal statutes to 'invalidate, impair, or supersede' state laws regulating insurance," *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 966 (8th Cir. 2008); *see* 15 U.S.C. § 1012(b). A federal statute is reverse-preempted under the McCarran-Ferguson Act if: (1) it does not "specifically relate[] to the business of insurance"; (2) a state statute was enacted "for the purpose of regulating the business of insurance"; and (3) the federal statute would "invalidate, impair, or supersede" the state statute. *Murff v. Pro. Med. Ins. Co.*, 97 F.3d 289, 291 (8th Cir. 1996) (quoting *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 501 (1993)).

27

The KraMers argue that the FAA acts to "impair" the UCPA and MCFA because Version 15's arbitration provision prohibits them from bringing private attorney general actions. ECF No. 32 at 28–29. The KraMers reason that, because the UCPA and MCFA do not provide private causes of action, the only basis for a private citizen to enforce the UCPA and MCFA is through Minnesota's private attorney general statute, Minn. Stat. § 8.31, subd. 3a.[7] *See id.* But because the arbitration provision prohibits private attorney general actions, the KraMers say, they will be effectively prohibited from bringing those claims, inhibiting enforcement under the UCPA and MCFA. ECF No. 32 at 9–10.

The FAA has been found to be preempted by state statutes in limited circumstances. But those circumstances are not present here. Generally, reverse-preemption may be found only when there is a specific state law "invalidating arbitration agreements in insurance policies." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 453–54 (4th Cir. 2017); *see also Certain Underwriters at Lloyds,*

---

[7] The Court doubts whether the KraMers even could bring a private attorney general action to enforce the UCPA. The Minnesota Supreme Court has expressly held that individuals *cannot* use the private attorney general statute to sue under the UCPA. *Morris v. Am. Fam. Mut. Ins. Co.*, 386 N.W.2d 233, 236–37 (Minn. 1986); *see also Findling v. Grp. Health Plan, Inc.*, 998 N.W.2d 1, 14 (Minn. 2023). The KraMers do not engage with *Morris*, but argue that they can bring UCPA claims by pointing to dicta found in a footnote of another case in this District. ECF No. 32 at 26–27 (citing *Estate of Lokken v. UnitedHealth Grp., Inc.*, 766 F. Supp. 3d 835, 849 n.5 (D. Minn. 2025)). There, however, another judge in this District simply noted that the Minnesota Supreme Court, in *Findling*, seemed to cast doubt on the continued validity of *Morris*, and noted—without deciding— that "a private right of action seems likely." *Est. of Lokken*, 766 F. Supp. 3d at 849 n.5. *Lokken* did not hold that the UCPA could be enforced through the private attorney general statute; to the contrary, it explicitly sidestepped the issue. *Id.* Nor did *Findling* overrule *Morris*. As a result, *Morris*'s holding stands.

*London v. 3131 Veterans Blvd. LLC,* 136 F.4th 404, 410 (2d Cir. 2025) (refusing to enforce arbitration agreement because it would "invalidate, impair, or supersede" a Louisiana law forbidding arbitration clauses in insurance contracts).  The reasoning is clear: where state law explicitly forbids the enforcement of arbitration agreements in insurance contracts, the FAA cannot be used to enforce them.  Here, however, the UCPA and MCFA do not expressly forbid arbitration agreements in insurance contracts, nor do the KraMers cite to any other Minnesota statute that does.  As a result, the enforcement of this arbitration agreement does not "invalidate, impair, or supersede" any state law.  *Saunders*, 537 F.3d at 966.

It may be true, as the KraMers argue, that if they are required to arbitrate, they will be prohibited from pursuing UCPA and MCFA claims.  But that is something they agreed to when they agreed to Version 15's arbitration provision.  The KraMers may argue in arbitration, of course, that the fact that they were required to give up their right to pursue a private attorney general claim makes the arbitration agreement unconscionable.  But where there is no Minnesota insurance statute prohibiting the enforcement of arbitration clauses in insurance contracts, the McCarran-Ferguson Act provides them no reprieve from the FAA's "liberal federal policy favoring arbitration agreements." *Epic Sys. Corp*, 584 U.S. at 505–06.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    The KraMers' Motion To Remand (ECF No. 18) is **DENIED**;

2.      Airbnb's Motion To Compel Arbitration (ECF No. 11) is **GRANTED**;

3.      The KraMers and Airbnb are directed to proceed to arbitration in accordance with the terms of Version 15;

4.      This case shall be **STAYED** pending resolution of this dispute in arbitration under 9 U.S.C. § 3;

5.      Upon resolution of the arbitration, the parties shall promptly and jointly file a letter informing the Court whether any further action in this Court is necessary, including enforcement of any arbitral award or dismissal of this case; and

6.      If The KraMers decide not to proceed to arbitration with Airbnb, the KraMers shall file a letter notifying the Court of such decision, and the parties shall promptly file a joint stipulation of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii).

Dated: June 29, 2026                           *s/Laura M. Provinzino*
                                               Laura M. Provinzino
                                               United States District Judge